Texas Central Railroad Company v. E. Bowman et al.

No. 1287.   Decided March 14, 1904.

**1.—Railroad—Right of Way—State School Land.**

The right of way given railroads over lands belonging to the State, by article 4423, Revised Statutes, extends to lands surveyed and set apart for the State school fund.   (Pp. 420, 421.)

**2.—Same—Constitution.**

The power of the Legislature to grant to railroads a right of way over the State's public school lands is not restricted by section 2 of article 7 of the Constitution, appropriating such lands to a perpetual school fund; nor by section 3 thereof, providing that such lands be sold; nor by section 17 of article 1, providing for compensation for private property taken for public use; nor by section 3 of article 14, limiting the power to grant public lands in aid of railway construction.   (Pp. 421-425.)

Error to the Court of Civil Appeals for the Second District, in an appeal from Comanche County.

The railroad company sued Bowman, appealed from a judgment for defendant, and on affirmance obtained writ of error.

*Clark & Bolinger* and *Hutchinson & Pressler,* for plaintiff in error.— These particular sections of land having been occupied and appropriated by the railroad company previous to the accrual of any rights of the defendants Bowman et al., its easement of a right of way over said land became fixed and vested under article 4423 of the Revised Civil Statutes of the State of Texas.   Rev. Stats., art. 4423; Smisson v. State, 71 Texas, 222; Swenson v. Taylor, 80 Texas, 586; Reed v. Rogan, 94 Texas, 182.

The authorities above cited would seem to establish the doctrine contrary to that held by the Court of Civil Appeals, in that they hold that the title and ownership to these public lands remain in the State, notwithstanding the setting apart by the Constitution for school purposes. The ruling of the Court of Civil Appeals, if sustained, would leave the question of railroad construction in a sad plight in so far as the unsettled lands of the west are concerned.   If the Legislature could not grant an easment over the public school lands, how could a right of way be obtained otherwise?   The Legislature is the custodian of these lands, lands standing in the name of a trustee, with title and ownership.   The life of a corporation is limited to fifty years, and if the Legislature is authorized to grant a lease of these lands for five years, in its discretion it is authorized to grant a lease for fifty years.   The same power to grant an easment is necessarily inherent as the legal accompaniment of actual ownership and title; and the mandate of the Constitution, that the lands shall be sold, necessarily leaves with the Legislature the discretion as to when they shall be sold.   The cases cited establish this doctrine.

The ruling of the Court of Civil Appeals is tantamount to placing

an inhibition upon the improvement of the school lands, according to the discretion of the Legislature. It is to the interest of the trust fund that the value of these lands be enhanced, if practicable, before being placed upon the market, and nothing is so capable of producing such immediate enhancement as the construction of railways across said lands, or in their immediate vicinity. Certainly the framers of the Constitution never contemplated a condition of affairs by which internal improvements in the State would be stopped, or that the Legislature could not, in its wisdom, provide for such enhancement in values as would redound to the interest of the fund.

*G. H. Goodson,* for defendants in error.—The Constitution having perpetually dedicated this character of land to the public school system of Texas, and having directed what should be done with the subject matter dedicated,—that is, having provided that the land should be sold and the proceeds employed for the benefit of the public school,— the Legislature had no power to make any different disposition of these lands, or to in any way so interfere with or delay the sale of said land as would interfere with the general uses and purposes of the dedication. Smisson v. State, 71 Texas, 222, and the authorities cited by counsel for appellant in that case, on page 224; Keuchler v. Wright, 40 Texas, 600; Fannin County v. Riddle, 51 Texas, 360; Seattle & M. R. R. Co. v. Washington, 7 Wash., 150, 22 Law. Rep. Ann., 217.

"Any lands belonging to 'this State'" was not intended by the Legislature, in adopting article 4423, to include public free school land that had been theretofore segregated from the great body of the public land, and which had by the Constitution been dedicated to a different purpose, and over which the Legislature had no power to grant the right claimed in this case by appellant.

It is respectfully insisted that the constitutional provisions had set apart the alternate sections of the railroad land to the public school fund, for sale, and for no other purpose, and had thereby withdrawn from the Legislature the power to dedicate it to any other use, and such being the case at the time when the Legislature passed article 4423, it ought to be presumed that it was only intended to mean such lands belonging to the State as the Legislature had the power to make disposition of; that is, "any lands belonging to the State" ought to receive a more restricted meaning, and ought only to mean and include such lands as the State through its Legislature could say belonged to it, in the light of making a present disposition of, and should not be held to include lands defined in many places in the statutes of the State as "lands belonging to the free school fund," as being public free school lands, as "lands set apart to the public school," "university lands," "asylum lands," etc.

The rule of statutory construction goes even further than is above insisted on, in this, that in giving meaning to words or terms, if the arbitrary meaning of the term would render the matter doubtful as

a constitutional question, and the circumstances are such that it is reasonable for a different meaning to be put upon the words and terms, then this different meaning must be put upon them, because it must be presumed that the Legislature did not intend to pass an unconstitutional act nor one of which the constitutionality might be said to be doubtful.

The argument that the Legislature has the power in the face of the Constitution to give away the school land, because by building railroads over it the lands and those contiguous thereto will be enhanced in value, is wholly impertinent to the matter. If it could act from such reasons, it could also establish public parks, give sections to build county sites on, establish summer and winter resorts, and enter into the illimitable field of speculative possibilities that would just as likely end in the spoliation as the building up of the land.

Statutes for exercise of the power of eminent domain are to be strictly construed; and while the question of eminent domain is not believed to be in this case, yet the principle should govern in the construction of this case; and there must be a very clear expression of the legislative intent to offer the taking of property which has already been devoted to the public use by an earlier act. To take the property already appropriated to another public use, the act of the Legislature must show the intent to do so by clear, express terms. A legislative intent that there should be such an effect will not be inferred from a gift of power made in general terms. This matter is fully discussed in Sutherland on Statutory Construction, at articles 388 and 389, and in Mills on Eminent Domain, at section 46, and in the authorities cited in those articles.

If it should be held that the Legislature did, in fact, intend to include the school lands of the State within the general description of "any lands belonging to the State," then, for all the reasons stated in the argument under the foregoing proposition, it is respectfully insisted that the act of the Legislature is unconstitutional. The act of the Legislature passed in 1900, in settling the account between the State and the permanent school fund, recognizes the difference that always existed between lands known as lands belonging to the State and lands belonging to the public free school fund, and the difference in description and in identity there recognized is the same difference of description and identity recognized throughout all the constitutional and statutory provisions relating to lands belonging to the State and lands belonging to the public free school fund. This act of the Legislature undertook to settle the account between the State and the free school lands as to the lands belonging to one and to the other, and clearly recognized that there was a difference between lands belonging to the State and lands belonging to the free school fund.

WILLIAMS, Associate Justice.—Plaintiff in error designated and occupied a strip of land for its right of way across an alternate section

of land surveyed for and appropriated to the public school fund.  Defendants in error have title to the section by purchase and patent from the State subsequent to the doing of the acts constituting the inception of the claim of the railroad company.  Both claims originated after the present Constitution and the Revised Statutes of 1879 took effect.  This action was begun by plaintiff in error to enjoin interference by defendants with its right of way; and, in their answer, defendants in error pleaded in reconvention for the land claimed by plaintiff, and by agreement in the District Court the cause was tried upon this cross-claim, all questions as to the injunction being eliminated.  The judgments of the District Court and Court of Civil Appeals were in favor of defendants for the strip of land in controversy.  The case depends entirely upon two questions of law, which are, first, does article 4423 of the present Revised Statutes, which is the same as article 4167 of the revision of 1879, give to railroad companies the right of way over such land as that in question? and second, if so, is this provision, as it so affects school lands, constitutional?  Article 4423 provides as follows:

"Every such corporation shall have the right of way for its line of road through and over any lands belonging to this State, and to use any earth, timber, stone or other material upon any such land necessary to the construction and operation of its road through or over said land."

1.  We have found no such provision in a general law earlier than the Revised Statutes of 1879.  Prior to the adoption of the present Constitution, railroad companies were incorporated under special charters, which generally, if not uniformly, gave the same right of way as that conferred by the provision now in question.  The general laws which had been enacted regulating railways therefore seem to have assumed, rather than to have expressly declared, the existence of the right over lands of the State, for the provisions made for the acquisition of such rights by purchase or condemnation applied only to private property. Pasch. Dig., arts. 4922, 4930, 4940.  The general law passed in 1876 for the chartering of railroad corporations omitted any express provision as to right of way upon lands of the State, but, as before, regulated the acquisition of such rights over private property by agreement or condemnation.  The codifiers of 1879 supplied the omission by inserting article 4167, and thereby placed such corporations, organized under general laws, upon an equality, in this respect, with those previously existing under special charters.  The same chapter in which this provision is found makes further distinction between the use of public and of private property, by authorizing the construction of railroads over streams of water, water courses, streets, highways, plank roads, turnpikes and canals, all of a public nature, with provisions for securing the rights of others than the State who might be interested in particular properties of the kind mentioned; and by specific provisions for obtaining the right over property wholly private by agreement or condemnation.  This mode of regulation runs through all the legislation upon this subject, there being no provision anywhere for the acquisition of

the right of way over property belonging to the State otherwise than by the donations found in the statutes. The language of article 4423, "any lands belonging to this State," is unquestionably comprehensive enough to embrace school lands which belong to the State. Smisson v. State, 71 Texas, 222. There is nothing whatever in any of the legislation on this subject to suggest a restriction upon the meaning of the language, but, on the contrary, the outline given shows the purpose of the Legislature always to have been to give in the fullest manner the right of way, when only the rights of the State were to be affected and rights of private property were not to be touched. The general provisions now in the Revised Statutes were only an adoption, for the benefit and encouragement of railroad corporations to be organized under general law, of the same policy which had always been pursued in granting special charters. Much of the land had been surveyed for the school fund by the latter class of corporations operating under charters giving right of way over the State's land. In some instances large reservations had been made by law of lands along the proposed routes of railroads for the location of the lands of the companies and the alternate school sections. It would be absurd to say that the right of way given in the charters of the companies which were to locate the lands did not apply to the lands when located by them; and, with the history of the subject in mind, it would be as unreasonable to hold that the provision introduced into the general law, quite as broad in its language, was intended to have a different effect, unless it is true that the Constitution imposes a restriction upon the power of the Legislature; and this brings us to the second question.

2. It is claimed that the Legislature is without power to grant such rights of way over school lands because of the provisions of the Constitution in the second section of article 7 that "all the alternate sections of land, etc., shall constitute a perpetual school fund;" and in the fourth section of the same article that: "The lands herein set apart to the public free school fund shall be sold under such regulations, at such times, and on such terms as may be prescribed by law." Other constitutional provisions, more or less affecting the question before us, are section 17 of article 1, "that no person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person;" sections 1 and 2 of article 10, which give to any railroad corporation, organized under the law for the purpose, "the right to construct and operate a railroad between any points within this State," and declare railroads to be public highways; and of section 3 of article 14 recognizing the power of the Legislature to continue the policy, previously characterizing legislation in this State, of granting to railroad companies lands in aid and encouragement of the construction of railroads, but putting upon the power certain restrictions which had not always existed. The building of railroads is here recognized, as it has always been in our legisla-

tion and in the law generally, as a public purpose the promotion of which justifies the use of public property and the taking of private property. The power to provide for the doing of these things is legislative in character and is vested in the Legislature subject to constitutional limitations. The only express restrictions are those contained in section 17, article 1, and section 3, article 14. The first evidently applies only to property in which others than the State are interested; but if it were held to apply to property belonging to the State, it would authorize the taking of it with the consent of the State, which only the Legislature could give. The second contains no inhibition against the exercise of such power as that here in question, but recognizes the existence of a much broader one and puts certain express restrictions upon it. It is not meant that the lands, grants of which are authorized by this latter provision, include school lands, but only that it puts upon a power to grant lands which otherwise existed certain express limitations, which do not include a denial of the power to grant to railways a right of way over lands belonging to the State. The power of the Legislature to devote the general property of the State to public purposes, without other compensation than such as arises from the advantages resulting from such use of it, is therefore not only not taken away, but is expressly recognized, and, unless the power here in question is excluded by the provisions on which defendants in error rely, it must be held to exist. If the contention, based upon the provisions creating and providing for the disposition of the school fund, that they take away all power from the Legislature to grant rights of way over the lands thus appropriated, is sound, it follows that these lands can not be subjected to any public use whatever, or dealt with otherwise than by outright sale. The objection would apply equally to legislative attempts to authorize the location upon them of public roads, courthouses and even public schoolhouses; for the contention is, in effect, that, as the lands must be sold, nothing else can be done with them. This argument loses sight of other legislative powers which inhere in the sovereign and which are conferred by the sovereign upon the Legislature. Such restrictions upon legislative action as there may be in the provisions last referred to are implied, and can not be held to exclude the existence of other powers, further than the latter may be inconsistent with the accomplishment of the objects of those provisions. "A power, clearly legislative in its character, not expressly denied to the Legislature, ought not to be held to be denied by implication unless its exercise would interfere with, frustrate, or to some extent defeat the exercise of a power expressly granted." Smisson v. State, 71 Texas, 233. "In the construction of constitutions, as well as of statutes, it has been often held that the powers necessary to the exercise of a power clearly granted will be implied; but we know of no case in which the express grant of a power, legislative in its character, has been held to carry with it an implied prohibition to exercise a power of that char-

acter, unless such implication is necessary to the full and free exercise of the power given." Smisson v. State, 71 Texas, 235; Lytle v. Halff, 75 Texas, 128. The sections of the Constitution concerning the school fund were adopted with knowledge of the existence of other legislative powers arising out of the same instrument, and are therefore to be construed with due regard to such other powers. Limitations may arise by implication from them which would exclude the power to divert the fund to other purposes or to provide for a different method than that prescribed of finally utilizing the lands to produce moneys for the support of the schools. Smisson v. State, supra. But the exercise of other powers upon the lands may not necessarily tend to defeat these limitations or the purposes which they were meant to secure. As we have said, the construction of railroads has been regarded, in all of our legislative history and in the Constitution itself, as a legitimate means of settling, improving and developing the resources of the State. The power to grant rights of way over the State's property had always been exercised as a proper means of securing these results. This power is not expressly denied by the Constitution, and as, judged by our own legislative history and the Constitution itself, it is to be regarded, not as an impediment, but as a help to the prescribed utilization of the school fund, it should not be held to have been denied by implication. In other words, the appropriation of these lands and the command to sell them were made in contemplation of the existence of other legislative powers which might be employed consistently with and in aid of the objects in view. The right granted to any company is only to the use of a narrow strip of land, of which the fee is not acquired by the railroad company but remains in the State, subject to its disposal; and the right of the railroad company is held subject to all conditions and limitations which by law attach to such property. No legitimate exercise of the power to grant such rights can materially impede the exercise of the other powers conferred over the school lands. This view is supported by the decision of the Supreme Court of the United States in the case of Illinois Central Railroad Co. v. Illinois, 147 U. S., 387. There, the railroad company claimed, under grants from the Legislature of Illinois, several rights in the soil under the navigable waters of lake Michigan, one of which was the right to use a strip of the land for its road, buildings and other appurtenances, and another was the title in fee to a large area, not so used, embracing the larger part of the harbor, and effectually displacing, if held valid, the power of the Legislature to regulate the improvement and use of the harbor for the public benefit. The court held, in substance, that the title to lands under navigable waters within the State is held by the State in trust for all its citizens; that the power over it is governmental in character, and that it can not therefore be granted away by one Legislature so as to deprive another of its legislative power to control and manage it for the benefit of the public; and the court denied the claim of the rail-

road company to the fee in the large area of submerged land, because the grant of it was, in its effect, a complete diversion of the property from the purposes of the trust upon which it was held. But the court made this distinction: "The interest of the people in the navigation of the waters and in the commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objection can be made to the grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public." And the judgment protected the railroad company in one of its claims and denied the other, in accordance with the law so stated. The purpose for which the school lands are required to be sold is the raising of money to support the schools, and this may be promoted in many ways by the exercise of other powers of the Legislature. Such powers are left in that body by the Constitution, and may be employed upon this land whenever the attempted exercise does not conflict with, and especially where it promotes, the power to sell to advantage. To the advancement of the purpose of selling the land advantageously, by settling up the country, bringing them into demand and thereby increasing their value, the Legislature might well regard the granting to railroad companies of rights of way over them as a legitimate means.

Another view of the Constitution sustains this legislation. The Legislature is permitted to provide for the incorporation of railroad companies by general law only (article 3, section 56), and it is provided that such companies "shall have the right to construct and operate a railroad between any points in this State." This gives the consent of the people of the State for the Legislature, in the laws to be enacted, to authorize such construction and operation so far as it affects the State only. A limitation is expressed in section 17 of article 1 which secures compensation for private property taken, but no such reservation is made in favor of the State. These provisions operate along with those in regard to the school fund, and the power given affects those lands as well as others belonging to the State.

Our conclusion is that the title purchased from the State by defend-

ants in error is subject to the right of way previously acquired by plaintiff in error, and that the judgments below should be reversed and that judgment should be here rendered that defendants in error take nothing by their cross-action, and that plaintiff in error be adjudged to be the owner of the statutory right of way claimed by it.

*Reversed and rendered.*